## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Hon. Robert B. Kugler, U.S.D.J.** |
| v. | Criminal No. 19-CR-191(RBK) |
| THOMAS SCHALLUS, et. al. | |
| Defendant. | |

---

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S PRETRIAL MOTIONS REGARDING
## DISMISSAL OF COUNT ONE OF THE INDICTMENT,
## SEVERANCE OF DEFENDANT'S CASE FROM THAT OF HIS CODEFENDANTS,
## AND A BILL OF PARTICULARS

---

WHIPPLE AZZARELLO, LLC
161 Madison Avenue, Suite 325
Morristown, New Jersey 07960
Telephone: 973-267-7300
JCWhipple@whippleazzarellolaw.com
Attorneys for Defendant Thomas Schallus

**Of Counsel and on the Brief:**
John C. Whipple, Esq. (1591)

**On the Brief:**
William J. Munoz, Esq.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

Statement of Facts .............................................................................................. 3

LEGAL ARGUMENT ........................................................................................... 6

I.    Count One of The Indictment Alleges Multiple Conspiracies in a Single Count and
Must Therefore be Dismissed as Duplicitous .......................................................... 6

    A.    Legal Standard ........................................................................................... 6

    B.    Duplicity Generally ..................................................................................... 6

    C.    Count One is Duplicitous Because It Alleges Multiple Conspiracies in a Single Count 8

    D.    The Kelly Factors ..................................................................................... 11

II.    Mr. Schallus' Case Must be Severed From That of His Codefendants for Trial...... 14

    A.    Severance generally ................................................................................. 14

    B.    The Gatto factors establish that substantial prejudice to Mr. Schallus would result if he
were tried jointly with the other defendants ......................................................... 17

    C.    Limiting instructions will not cure a spill-over effect of the evidence against the
Hickmans and the jury will be unable to compartmentalize the evidence as it pertains to the
charges against the other defendants.................................................................. 20

III.    The Government Must Provide Particulars as to The Falsehoods Allegedly
Contained in the Prescriptions Described in Counts 11, 12, and 13. ................... 22

Conclusion .................................................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Blumenthal v. United States*, 322 U.S. 539 (1947)..............................................................9, 10

*Braverman v. United States*, 317 U.S. 49 (1942)......................................................8

*Bruton v. United States*, 391 U.S. 123 (1968) ......................................................15

*Franklin v. Franklin*, 471 U S. 307 (1985) ...........................................................20

*Garrett v. United States*, 471 U.S. 773 (1985).......................................................6

*Kotteakos v. United States*, 328 U.S. 750 (1946) ...........................................8, 9, 10

*Richardson v. Marsh*, 481 U.S. 200 (1987)...........................................................21

*Russell v. United States*, 369 U.S. 749 (1962) .......................................................7

*Stanford v. Parker*, 266 F.3d 422 (6th Cir. 2001) .................................................20

*United States v. Addonizio*, 451 F.2d 49 (3d Cir. 1971).........................................22

*United States v. Armocida*, 515 F.2d 49 (3d Cir. 1975).........................................23

*United States v. Becker*, 892 F.2d 265 (3d Cir. 1989) ...........................................13

*United States v. Begay,* 42 F.3d 486 (9th Cir. 1994) ................................................8

*United States v. Belkin*, No. 93-CR-240 TNO,
    1993 U.S. Dist. LEXIS 17202 (E.D. Pa. Dec. 8, 1993).......................................22

*United States v. Broce*, 488 U.S. 563 (1989)...........................................................8

*United States v. Brodie*, No. 00-CR-629-4 MAM,
    2001 U.S. Dist. LEXIS 10533 (E.D. Pa. 2001)...........................................15, 21

*United States v. Castro*, 776 F.2d 1116 (3rd Cir. 1985).........................................10

*United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004) ................................12, 13

*United States v. Cianciulli*, 476 F. Supp. 845 (E.D. Pa. 1979) .............................17, 18, 19, 20

*United States v. Clemente*, 494 F. Supp. 1310 (S.D.N.Y. 1980) ..............................................15

*United States v. De Larosa*, 450 F.2d 1057 (3d Cir. 1971) .....................................................15

*United States v. Eufrasio*, 935 F.2d 553 (3d Cir. 1991) ..........................................................22

*United States v. Gatto*, 746 F. Supp. 432 (D.N.J. 1990) ..........................................16, 17, 19

*United States v. Gomberg*, 715 F.2d 843 (3d Cir. 1983) ...........................................................6

*United States v. Grossman*, 272 F. Supp. 2d 760 (N.D. Ill. 2003) ..........................................21

*United States v. Haddy*, 134 F.3d 542 (3d Cir.1998) ................................................................7

*United States v. Huet*, 665 F.3d 588 (3d Cir. 2012) .................................................................6

*United States v. Kelly,* 892 F.2d 255 (3d Cir. 1989) ...........................................................8, 11

*United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007). .....................................................passim

*United States v. Kenny*, 462 F.2d 1205 (3d Cir. 1972) .............................................................8

*United States v. Knight*, 12-CR-0367 RBS,
    2013 U.S. Dist. LEXIS 198970 (E.D. Pa. July 3, 2013) ...............................................22, 23

*United States v. Mastelotto*, 717 F.2d 1238 (9th Cir. 1983) ......................................................7

*United States v. Moore*, 917 F.2d 215 (6th Cir. 1990) ...........................................................21

*United States v. Nolan*, 718 F.2d 589 (3d Cir. 1983) ...............................................................8

*United States v. Padilla*, 982 F.2d 110 (3d Cir. 1992) ...........................................................11

*United States v. Sourlis*, 953 F. Supp. 568 (3d Cir. 1996) .......................................................7

*United States v. Starks*, 515 F.2d 112 (3d Cir. 1975) ...............................................................7

*United States v. Stillo*, 57 F.3d 553 (7th Cir. 1995) ................................................................21

*United States v. Thornton*, 1 F.3d 149 (3d. Cir. 1993) ...........................................................15

*United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969) .............................................................8

*Zafiro v. United States*, 506 U.S. 534 (1992) .................................................................15, 16

## Statutes

18 U.S.C. § 1343 ..................................................................................................3, 19

18 U.S.C. § 1347 ..................................................................................................3, 23

18 U.S.C. § 1349 ......................................................................................................3

18 U.S.C. § 1956(h) ...............................................................................................19

18 U.S.C. § 2 ......................................................................................................19, 23

## Rules

Federal Rule of Criminal Procedure 12(b)(3)(B) .....................................................6

Federal Rule of Criminal Procedure 14 .................................................................15

Federal Rule of Criminal Procedure 14(a) .......................................................14, 15

Federal Rule of Criminal Procedure 7(f) ...............................................................22

Federal Rule of Criminal Procedure 8 ...................................................................15

Federal Rule of Criminal Procedure 8(a) ................................................................6

## PRELIMINARY STATEMENT

Defendant Thomas Schallus brings these omnibus motions to dismiss certain Counts of the indictment, to sever his case from that of his codefendants, and to direct the Government to supply a bill of particulars regarding the indictment. Count One of this Indictment suffers from a critical defect rendering it subject to dismissal; specifically, Count One is duplicitous because it facially alleges multiple conspiracies in a single count. Count One alleges that codefendants defendants Walter Hickman and Sara Hickman (collectively "the Hickmans"), through their company, Boardwalk Medical, LLC were at the center of a scheme designed to defraud insurers by submitting false and fraudulent insurance claims for medication to New Jersey's State Pharmacy Benefits Administrator. The indictment alleges that Boardwalk entered into an agreement with a certain compounding pharmacy ("Compounding Pharmacy") to receive compensation for each prescription Boardwalk directed to Compounding Pharmacy. The indictment also alleges that Boardwalk entered into relationships with recruiters who were tasked with finding individuals willing to obtain prescriptions and also to recruit other sub-recruiters to do the same. The recruiters allegedly paid the sub-recruiters to obtain their own prescriptions and to seek others willing to obtain prescriptions.

Although it purports to charge a single conspiracy, Count One actually alleges multiple conspiracies arranged in a rimless "hub and spoke" structure, wherein the various actors are engaged in smaller conspiracies, connected only by their relation to the Hickmans. The indictment does not allege that the recruiters or sub-recruiters were aware of the scope of the Hickmans' operation, nor does it allege that the various "spokes" were in any way interdependent or interested in the success of the others. In fact, Count One alleges multiple conspiracies, each with its own cash-flow and incentive system. These alleged schemes are insufficiently connected or

interdependent to be charged in a single count. Because Count One charges multiple offenses in a single count, it is duplicitous and must be dismissed.

Mr. Schallus also moves to sever his case from that of his codefendants. The fifty-count Indictment alleges a large and complex scheme in which Mr. Schallus allegedly played a relatively minor role. The Indictment alleges that the Hickmans' scheme involved at least 13 indicted and unindicted coconspirators and caused the Pharmacy Benefits Administrator to pay the Compounding Pharmacy in excess of $50,000,000. Mr. Schallus, by comparison, was allegedly involved in faxing prescriptions for three individuals to the Compounding Pharmacy. The indictment alleges transactions by which Mr. Schallus derived approximately $40,000 from the scheme – less than one one-thousandth of the amount allegedly paid to Compounding Pharmacy by the Pharmacy Benefits Administrator.

This case involves voluminous discovery and the Government's case will certainly involve the presentation of an overwhelming deluge of documentary evidence which would be otherwise inadmissible or excluded as to Mr. Schallus. Because Mr. Schallus allegedly played a minimal role in this case, he would be unjustly prejudiced by the tremendous volume of highly inflammatory evidence that will certainly be presented to the jury as to his codefendants. To proceed with a joint trial would thus result in a miscarriage of justice for Mr. Schallus.

Finally, Mr. Schallus moves for a bill of particulars. He specifically seeks the disclosure of the exact false or fraudulent statements that the Government alleges Mr. Schallus caused to be made in relation to Counts 11, 12, and 13. Without disclosure of the specific statements, Mr. Schallus is left to guess what alleged falsehoods he is accused of, thereby hindering his ability to adequately prepare for trial.

## STATEMENT OF FACTS

Defendant Thomas Schallus was indicted on March 13, 2019 along with six co-defendants for their alleged involvement in a Conspiracy to Commit Healthcare Fraud and Conspiracy to Commit Wire Fraud contrary to 18 U.S.C. §§ 1347 and 1343, in violation of 18 U.S.C. § 1349. The fifty-count indictment specifically charges Mr. Schallus with one (1) count of Conspiracy to Commit Healthcare Fraud and Wire Fraud (Count One) and three (3) counts of substantive Healthcare Fraud in violation of 18 U.S.C. § 1347 (Counts 11, 12, and 13).

The indictment specifically alleges the following:

The State Health Benefits Program ("SHBP") and School Employees Health Benefits Program ("SEHBP") offered medical and prescription drug coverage to qualified public employees, retirees, and dependents. (Indictment ¶ 2). The "Pharmacy Benefits Administrator" ("PBA") provided pharmacy benefit management services for beneficiaries of SHBP, SEHBP, and other insurance plans. (*Id.*) The PBA adjudicated claims for reimbursement from pharmacies, paid pharmacies for valid claims, and billed the State of New Jersey and other insurers based on the amount paid to the pharmacies for these claims. (*Id.*)

Compounded drugs are a type of drugs, produced by a so called "compounding pharmacy" that may be appropriately prescribed by a physician when FDA-approved medication do not meet the health needs of a particular patient. (*Id.*) A particular compounding pharmacy ("Compounding Pharmacy") located in Louisiana filled prescriptions for individuals with prescription drug coverage administered by the PBA. (*Id.*) When it received such a prescription, the Compounding Pharmacy would electronically verify with the PBA that the individual had prescription drug coverage and that the prescription was within the individual's plan. (*Id.*) It would then fill the

3

prescription, mail the medication to the individual, bill the PBA for the prescription, and receive payment from the PBA. (*Id.*)

William Hickman was a pharmaceutical sales representative who was prohibited by the terms of his employment from independently selling medical products or pharmaceuticals. (Indictment at ¶ 1). William Hickman and his wife, Sara Hickman (collectively "the Hickmans"), created a company, Boardwalk Medical, LLC ("Boardwalk") to skirt this restriction. (*Id.*) Through Boardwalk, the Hickmans entered into an agreement with Compounding Pharmacy under which Compounding Pharmacy would compensate Boardwalk for every prescription Boardwalk referred to Compounding Pharmacy to be filled. (*Id.*) The Indictment alleges that, in February 2015 Sara and William Hickman jointly caused Sara Hickman to obtain a prescription to be filled by Compounding Pharmacy. (Indictment at ¶ 24). The Indictment alleges that on three other occasions, from February 2015 to October 2015, William Hickman personally caused prescriptions for Thomas Sher and two unnamed individuals to be faxed to Compounding Pharmacy.

The indictment alleges that in addition to directly seeking individuals to obtain prescriptions for Compounding Pharmacy to fill, the Hickmans also developed a network of recruiters (the "top-level recruiters") who were given two tasks: first, the recruiters were to find individuals who would agree to obtain prescriptions to be filled by Compounding Pharmacy. (Indictment at ¶¶ 7 and 8). For each prescription obtained in this manner, Boardwalk would pay the top-level recruiter a portion of the money Boardwalk received from Compounding Pharmacy for the prescription. (Indictment at ¶ 9). Second, the top-level recruiters were to recruit other individuals ("sub-recruiters") to find additional individuals who would agree to obtain prescriptions. (Indictment at ¶ 8). Boardwalk would allegedly pay each top-level recruiter for any prescription obtained by one of his sub-recruiters. (Indictment at ¶ 9). The top-level recruiter, in

4

turn, would allegedly pay the sub-recruiter for any prescription the sub-recruiter obtained. (Indictment at ¶ 8). The top-level recruiters and sub-recruiters allegedly offered individuals payment to induce them to obtain prescriptions. (Indictment at ¶ 10).

The indictment specifically alleges that the Hickmans enlisted codefendant Brian Pugh as a top-level recruiter, as well as Judd Holt, Michael Sher, Matthew Tedesco, Steven Urbanski, and Richard Zappala, none of whom is a defendant in this case. (Indictment at ¶ 7). The indictment further charges that Pugh enlisted Schallus as a sub-recruiter. (Indictment at ¶ 8). According to the indictment, Michael Sher recruited his brothers John Sher and Thomas Sher as sub-recruiters, while Matthew Tedesco allegedly enlisted codefendant Christopher Broccoli and others as sub-recruiters. (*Id.*) As alleged in the indictment, the sub-recruiters were only ever paid by their respective top-level recruiter. (*See e.g.* Indictment at ¶ 36).

The indictment alleges that the prescriptions were secured without any medical determination that the prescriptions were necessary, and that the prescriptions were specifically selected to yield the highest possible reimbursement. (Indictment at ¶¶ 14 and 15). According to the indictment, William Hickman paid doctors including John Gaffney, to sign the prescriptions, which were then faxed from the doctors' offices to the Compounding Pharmacy. (Indictment at ¶¶ 18-19). The indictment specifically alleges that on various occasions, certain individuals caused the transmission, via fax, of prescriptions to Compounding Pharmacy. (Indictment at ¶¶ 24, 26, 28). Counts 11, 12, an 13 allege that William Hickman, Pugh, and Mr. Schallus collectively caused the faxing of three prescriptions for three individuals on three occasions. (Indictment at ¶ 24).

The indictment alleges that PBA payed Compounding Pharmacy over $50,000,000 for compounding medication. (Indictment at ¶ 2). It alleges that the Hickmans, through Boardwalk, were paid over $26,000,000 from Compounding Pharmacy. (Indictment at ¶ 2).

5

## LEGAL ARGUMENT

### I.  Count One of The Indictment Alleges Multiple Conspiracies in a Single Count and Must Therefore be Dismissed as Duplicitous

#### A. Legal Standard

The Court of Appeals for the Third Circuit has held that an indictment is sufficient if it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007).

Generally, the Government must charge separate offenses in separate counts of an indictment. See FED. R. CRIM. P. 8(a). Federal Rule of Criminal Procedure 12(b)(3)(B), in turn, allows a criminal defendant to file a motion to dismiss an indictment on the basis that the indictment is duplicitous, multiplicitous, lacks specificity, improperly joins defendants or charges, or fails to state an offense. FED. R. CRIM. P. 12(b)(3)(B). "In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment" and "determin[e] whether, assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged." *United States v. Huet*, 665 F.3d 588, 595-96 (3d Cir. 2012).

#### B. Duplicity Generally

"Duplicity" is the improper joinder of two or more separate offenses in a single count. *See United States v. Gomberg*, 715 F.2d 843, 845 (3d Cir. 1983) (overruled on other grounds); *Garrett v. United States*, 471 U.S. 773 (1985). "Duplicitous counts may conceal the specific charges, prevent the jury from deciding guilt or innocence with respect to a particular offense, exploit the

6

risk of prejudicial evidentiary rulings, or endanger fair sentencing." *United States v. Haddy*, 134 F.3d 542, 548 (3d Cir.1998) (internal citations omitted).

When a district court is faced with a motion challenging an indictment as duplicitous, the court's review is limited; "the task is not to review the evidence . . . to determine whether it would support charging several crimes rather than just one, but rather to solely assess whether the indictment itself can be read to charge only one violation in each count." *United States v. Sourlis*, 953 F. Supp. 568, 572 (3d Cir. 1996) (citing *United States v. Mastelotto*, 717 F.2d 1238, 1244 (9th Cir. 1983)). In this case, Count One of the indictment cannot be read to allege anything other than multiple conspiracies in a single count and it must therefore be dismissed.

If a court finds that an indictment is duplicitous it must take one of two courses of action; it must either dismiss the duplicitous count in the indictment or require the Government to make an election to select and charge one, but not all, of the offenses embraced in the duplicitous count. *See Sourlis*, 953 F. Supp. at 572; *United States v. Starks*, 515 F.2d 112, 117 (3d Cir. 1975) (finding that a single count charging conspiracy to extort and attempt to extort was duplicitous and requiring an election). A duplicitous indictment cannot be cured by a bill of particulars. *Russell v. United States*, 369 U.S. 749, 770 (1962); 1 Charles Alan Wright, Federal Practice and Procedure, Criminal §§ 125, 129 (3d ed. 1999). The Supreme Court articulated the reason behind this rule in *Russell v. United States*:

> To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time, they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant would then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him.

[82 S. Ct. 1038, 1050, 369 U.S. 749, 770, 8 L. Ed. 2d 240 (1962).]

7

C.  Count One is Duplicitous Because It Alleges Multiple Conspiracies in a Single Count

The essence of a conspiracy is an agreement. *United States v. Kelly,* 892 F.2d 255, 258 (3d Cir. 1989) (citing *United States v. Nolan,* 718 F.2d 589, 595 (3d Cir. 1983). "The gist of the crime of conspiracy as defined by the statute is the agreement . . . to commit one or more unlawful acts," from which it follows that "the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects." *Braverman v. United States,* 317 U.S. 49, 53 (1942). "In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy." *United States v. Varelli,* 407 F.2d 735, 742 (7th Cir. 1969).

"[A] single agreement to commit several crimes constitutes one conspiracy; multiple agreements to commit separate crimes constitute multiple conspiracies." *United States v. Broce,* 488 U.S. 563, 570-571 (1989). "[T]he Government may not charge 'multiple unrelated conspiracies,' but it can charge a 'master conspiracy [with] more than one subsidiary scheme.'" *Kemp,* 500 F.3d at 287 (quoting *United States v. Kenny,* 462 F.2d 1205, 1216 (3d Cir. 1972)). In determining whether an indictment is duplicitous for stating multiple conspiracies, the Court should look to the indictment itself. *See, e.g. United States v. Begay,* 42 F.3d 486, 501 (9th Cir. 1994).

The United States Supreme Court dealt with the matter of multiple conspiracies charged in a single count in *Kotteakos v. United States*, 328 U.S. 750 (1946). In *Kotteakos*, all defendants were charged in a single overarching conspiracy to obtain fraudulent loans from a federal agency where one defendant had processed all of the loan applications. Finding that the evidence established not the single conspiracy charged but multiple separate conspiracies, with the common

8

defendant at the center of each, the Court reversed the convictions based on that material variance from the indictment. *Id.* at 772. Significantly however, the Court noted that "the problem is not merely one of variance [] but is also essentially one of proper joinder[.]" *Id.* at 774. The Court explained that defendants who separately conspire with a common conspirator cannot be charged together because a series of similar, but separate, conspiracies "is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it." *Id.* at 773. The Court added that the overarching conspiracy charged had violated the defendants' "right not to be tried en masse for the conglomeration of distinct and separate offenses" they committed. *Id.* at 775.

The following year, the Supreme Court addressed another overarching conspiracy charge in *Blumenthal v. United States*, 322 U.S. 539 (1947). In *Blumenthal*, several salesmen employed by the same company were charged with conspiring to inflate the company's whiskey prices. In affirming their conspiracy convictions, the Court reasoned that the salesmen knew of the conspiracy's scope and the need for other salesmen's involvement and concluded that their individual acts "were merely steps in the formation of the larger and ultimate more general conspiracy." *Blumenthal*, 322 U.S. at 557. The Court distinguished this case from *Kotteakos*, noting that in *Kotteakos*:

> each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects. Except for [the loan broker], the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with [the loan broker] and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, overall comprehensive plan.

9

[*Id.* at 558.]

Federal courts have since construed *Kotteakos* and *Blumenthal* to prohibit so-called "rimless wheel" conspiracy charges where no evidence establishes that the "spokes" knew of and depended on each other. As the Third Circuit Court of Appeals has explained:

> The "wheel" conspiracy describes an arrangement of co-conspirators around a central figure, or "hub," who deals separately with peripheral figures, or "spokes." Each of the spokes is a member of the conspiracy even though they may not have any direct relations with one another. These peripheral members must have been aware of one another and have done something in furtherance of a single illegal enterprise, however, or it is said that the conspiracy alleged lacks "the rim of the wheel to enclose the spokes."
>
> [*United States v. Castro*, 776 F.2d 1116, 1124 n.4 (3rd Cir. 1985) (quoting *Kotteakos*, 66 S. Ct. at 1243) (emphasis supplied). *See also United States v. Kemp*, 500 F.3d at 287-88 and 291(holding that the evidence established multiple conspiracies, not the single overarching conspiracy charged, where "the government charged a hub-and-spokes conspiracy but failed to prove the existence of a rim connecting the spokes" because "there must be overlap among the spokes, not just between the hub and the various spokes").] [1]

That is, "there must be overlap among the spokes, not just between the hub and the various spokes," to find a single hub-and-spoke conspiracy[.]" *Kemp*, 500 F.3d at 291. "[T]he inquiry must focus . . . on the character of the agreement between the spokes." *Id.* In this case, Count One does not allege a single conspiracy with multiple objectives, but instead impermissibly alleges

---

[1] Other Courts of Appeals have reversed overarching conspiracy convictions in such situations. *See, e.g., United States v. Fernandez*, 892 F.2d 976, 989 (11th Cir. 1989) (reversing "wheel" conspiracy conviction where the trial evidence established two separate conspiracies even though both conspiracies shared the same "ultimate goal, [] had a common member, [and] used similar but not identical strategies"); *United States v. Castro*, 829 F.2d 1038, 1045 (11th Cir. 1987) (reversing "wheel" conspiracy conviction where prosecution "failed [] to demonstrate that there was a 'rim' to this 'wheel'"); *United States v. Levine*, 546 F.2d 658, 661 (5th Cir. 1977) (reversing "wheel" conspiracy conviction where "[t]he only real underpinning for the government's conspiracy count was the false legal premise that proof of proximate or separate conspiracies with one common conspirator was sufficient to establish the existence of a single conspiracy").

multiple conspiracies in a single count. Because Count One prejudicially combines multiple distinct offenses, it must be dismissed as duplicitous.[2]

### D. The Kelly Factors

Count One alleges at least three distinct conspiracies: (1) the Pugh conspiracy, wherein the Hickmans recruited Pugh, who recruited Mr. Schallus; (2) the Sher conspiracy, wherein the Hickmans recruited Michael Sher, who recruited his brothers, John Sher and Thomas Sher; and (3) the Tedesco conspiracy, wherein the Hickmans recruited Tedesco, who recruited Christopher Broccoli. The indictment also implies another conspiracy(and perhaps multiple ones) wherein the Hickmans, without the use of any recruiter, directly solicited individuals to obtain prescriptions to be filled by Compounding Pharmacy. (Indictment at ¶ 17).

In order to determine whether a group of individuals engaged in a single conspiracy or multiple conspiracies, the Court must evaluate three factors: (1) "whether there was a common goal among the conspirators"; (2) "whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators"; and (3) "the extent to which the participants overlap in the various dealings." *Kelly,* 892 F.2d at 259. Members of a single conspiracy must be aware of the scheme and the existence of other members, and their activities must be interdependent or mutually supportive. *See Kemp*, 500 F.3d at 288-89. "[T]he absence of one [*Kelly*] factor, [however,] does not necessarily defeat an inference of the existence of a single conspiracy." *United States v. Padilla*, 982 F.2d 110, 115 (3d Cir. 1992).

---

[2] Defendant is mindful that "[t]he issue of whether a single conspiracy or multiple conspiracies exist is a fact question to be decided by a jury." *United States v. Freeman* 763 F.3d 322, 343 (3ʳᵈ Cir. 2014). However, the instant motion does not contest the sufficiency of the evidence to prove a single conspiracy. Instead, defendant contends that even accepting the allegations in the indictment as true, Count One alleges multiple distinct conspiracies in a single count and is therefore duplicitous and subject to dismissal.

As to the first factor, defendant concedes that the indictment alleges that each of the separate conspiracies had similar goals. That is, the members of each conspiracy allegedly sought to make money by obtaining prescriptions to be fulfilled by Compounding Pharmacy. However, although each individual conspiracy had the same goal, it was not a *common* goal. That is, each conspiracy allegedly operated with the goal of obtaining prescriptions in exchange for payment from Compounding Pharmacy, but each conspiracy's goal was parallel to the goals of the other conspiracies rather than united in purpose. *See United States v. Chandler*, 388 F.3d 796, 811 (11th Cir. 2004) ( "although each of these alleged spoke conspiracies had the *same* goal, there was no evidence that this was a *common* goal")(emphasis added)).

As to the second factor, the indictment does not allege an agreement that contemplated bringing to pass a continuous result that would not continue without the continuous cooperation of the conspirators. The purported object of the conspiracy in Count One was for the actors to "unlawfully enrich themselves by causing the submission of false and fraudulent insurance claims for compounded prescription medications to [PBA] and by receiving a percentage of the money that [PBA] paid for those compounded prescription medications." (Indictment at ¶ 4). Certainly, Count One alleges that the various actors were engaged in an ongoing effort to obtain prescriptions and that each actor's object was to earn money based on obtaining those prescriptions. However, Count One does not allege that the actors contemplated a continuous result that would not continue without the continuous cooperation of the conspirators. The indictment clearly alleges that each individual, from the Hickmans down to the sub-recruiters, could and did directly solicit others to obtain prescriptions to be filled by Compounding Pharmacy. Although the indictment may allege that each actor's participation led to a greater overall volume of prescriptions filled by Compounding Pharmacy, the indictment does not allege that the alleged submission of fraudulent

insurance claims "would not continue without the continuous cooperation of the conspirators." Instead, the indictment alleges that the Hickmans, in addition to the recruiters and sub-recruiters, were personally responsible for obtaining prescriptions to be filled by Compounding Pharmacy. Although the indictment certainly alleges that the efforts of the recruiters and sub-recruiters increased the volume of prescriptions sent to Compounding Pharmacy, the scheme could have been, and allegedly was for a time, carried out by the Hickmans without the involvement of any of the purported coconspirators.

Third, and crucially, this Court must consider "the extent to which the participants overlap in the various dealings." Members of a single conspiracy must be aware of the scheme and the existence of other members, and their activities must be interdependent or mutually supportive. *See Kemp*, 500 F.3d at 288-89. There must be some interdependence among the members of a single conspiracy so that each member depends upon, is aided by, or has any interest in the success of the others. *See Kemp*, 500 F.3d at 287-89.

In this case, the indictment makes no allegation that Mr. Schallus knew or should have known about the activities of any other actors aside from Pugh and William Hickman, the alleged members of his "spoke." Moreover, this is not is "the type of conspiracy that *must* have had other members[.]" *Kemp*, 892 F.2d at 289. *Cf. Chandler*, 388 F.3d at 811 n.21 ("In a drug conspiracy, in which the object of the conspiracy is clearly illegal and there are various clandestine functions to perform, the conspirators can be charged with knowledge that others are performing these different functions. In this case, however, such knowledge may not be imputed to defendants since each of their redemptions was complete unto itself.") (citation omitted). Overlap in personnel is "not indicative of only one conspiracy." *United States v. Becker*, 892 F.2d 265, 268 (3d Cir. 1989).

13

Here, the indictment alleges no real overlap between the various "spokes." It instead alleges multiple distinct conspiracies. Specifically, Count One alleges that the Hickmans recruited various top-level recruiters, each of whom was responsible for obtaining prescriptions either directly from other individuals, or recruiting sub-recruiters to obtain prescriptions from individuals. None of the top-level recruiters is alleged to have had an interest in whether any of the other top-level recruiters succeeded in their objectives. Likewise, the indictment does not describe a scheme in which the sub-recruiters would have had an interest in the success of other sub-recruiters or top-level recruiters with whom they were not directly working. Instead, the defendants in each separate spoke were only interested in the success of the other actors in their spoke. For instance, there is no indication that Mr. Schallus, allegedly part of the Pugh conspiracy, was even aware of the alleged Tedesco conspiracy or the Sher conspiracy. Moreover, the indictment neither alleges nor infers that Mr. Schallus had any interest in the success of those conspiracies. Instead, Mr. Schallus' only alleged interest was in recruiting individuals to obtain prescriptions that would ultimately be filled by Compounding Pharmacy. Brian Pugh's interest was likewise limited to the success of Mr. Schallus and his other sub-recruiters. As alleged, Pugh's interests were entirely separate and distinct from those of the other recruiters and their sub-recruiters.

Because the indictment actually alleges numerous distinct conspiracies in Count One, Count One must be dismissed as duplicitous.

## II.    Mr. Schallus' Case Must be Severed From That of His Codefendants for Trial

### A. Severance generally

Federal Rule of Criminal Procedure 14(a) governs the relief from prejudicial joinder and states in pertinent part that:

14

"Relief. If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

Rule 14 is designed to promote economy and efficiency and to avoid multiplicity of trials where these objectives can be achieved without substantial prejudice to the right of defendants to fair trial. *Bruton v. United States*, 391 U.S. 123, 132 (1968). There is a preference in the federal system for joint trials of defendants who are indicted together. *Zafiro v. United States*, 506 U.S. 534, 537 (1992). Absent substantial prejudice to the accused, persons properly joined under Rule 8 should be jointly tried to conserve judicial resources, alleviate burdens on citizens serving as jurors, and to avoid necessity of having witnesses reiterate testimony in series of trials. *United States v. Clemente*, 494 F. Supp. 1310, 1325 (S.D.N.Y. 1980). The determination of risk of prejudice and any remedy that may be necessary is at the sound discretion of the district courts. *Zafiro*, 506 U S. at 541. If it appears that a defendant or the Government is prejudiced by a joinder of offenses or defendants in an indictment or information, the court may order an election or separated trials of counts, grant a severance of defendants, or provide whatever other relief justice requires. *United States v. Thornton*, 1 F.3d 149, 152 (3d. Cir. 1993).

Severance under Rule 14 should be granted "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Brodie*, No. 00-CR-629-4 MAM, 2001 U.S. Dist. LEXIS 10533, 5 (E.D. Pa. 2001) (citing *Zafiro*, 506 U.S. at 539). The Third Circuit has held that "the primary consideration is whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility." *Id.* at 5 (citing *United States v. De Larosa*, 450 F.2d 1057, 1065 (3d Cir. 1971)).

The risk of prejudice therefore varies with the facts of each case, leaving the determination of the level of prejudice and applicable remedies to the sound discretion of the district court. *Zafiro*, 506 U.S. at 541. Among the factors the court must consider in determining whether the prejudice of a joint trial rises to the level of a "miscarriage of justice" are the following:

> (1) the number of defendants and the number of counts;
>
> (2) the complexity of the indictment;
>
> (3) the estimated length of the trial;
>
> (4) disparities in the amount or type of proof offered against the defendants;
>
> (5) disparities in the degrees of involvement by defendants in the overall scheme;
>
> (6) possible conflict between the various defense theories or trial strategies; and, especially
>
> (7) prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant
>
> [*United States v. Gatto*, 746 F. Supp. 432, 446 (D.N.J. 1990) (rev'd on other grounds)].

Mr. Schallus contends that in applying the factors outlined in *Gatto* to the case at bar and considering the prospective inability for a jury to be given limiting instructions that would allow the compartmentalization of evidence, it is clear that a serious risk exists that a substantial prejudice would ensue should he be tried together with his codefendants. This concern is amplified if the Court determines that Count One is subject to dismissal for duplicity because it alleges multiple conspiracies in a single count because evidence against the members of one conspiracy would not necessarily be admissible against members of the others. As such, severance is necessary to ensure a fair trial.

16

B. The *Gatto* factors establish that substantial prejudice to Mr. Schallus would result if he were tried jointly with the other defendants

The first, second, and third factors to be considered in determining whether the prejudice of a joint trial is substantial enough to warrant severance are the number of defendants and counts, the complexity of the indictment, and the estimated length of trial. The case at bar involves a fifty (50) count indictment, charging seven defendants with various crimes allegedly stemming from multiple conspiracies (albeit improperly pleaded as a single conspiracy) involving untold unindicted individuals. The indictment itself is over thirty (30) pages long and outlines a variety of instances of alleged criminal activity as they pertain to each of the crimes charged. On its face, the indictment is dense, complex, and contains varying levels of involvement for each of the seven defendants. It details alleged acts of illegality spanning a twenty-one month period from July 2014 through April 2016, allegedly conducted through various corporate entities. It is evident that when the government is put to its proofs, each count of the indictment will require the admission of extensive and voluminous evidence; including, but not limited to telephone records, bank records, medical records, witness testimony, emails records, and expert testimony. Between jury selection, the government's proofs, and each defendant putting forth each of their individual defenses, the length of this trial, if tried together, has been estimated to be 8-10 weeks or even longer.

The Third Circuit has ordered separate trials for highly complex indictments before. In *United States v. Cianciulli*, 476 F. Supp. 845 (E.D. Pa. 1979), the court ordered separate trials for a forty-nine (49) count indictment, charging twenty-three (23) defendants with violations of five (5) separate criminals statutes concerning diverse factual circumstances over a three-year period. The *Cianciulli* court found that a prerequisite showing of prejudice warranting severance occurs in two primary contexts:

"First, the inherent problems entailed with any mass trial, which involve the presence of numerous defendants and their counsel, several-count indictments, violations of multiple criminal statutes and varying and complicated factual situations, can prejudice individual defendants . . . Second, inherently related to the first consideration is the due process requirement under the Fifth Amendment mandating a fair trial before an impartial jury to each individual defendant. This due process right is often usurped when many defendants are tried together, thus increasing the likelihood of the serious risk of confusion to the jury which could result from the aforementioned problems of a mass trial. This can lead to jurors being unable to sort out the counts charged and the evidence presented against each individual defendant in order to impartially determine guilt or innocence. This problem of guilt by association or numbers is maximized by the size, diversity and complexity of the trial."

[*Id.* at 846-847.]

Factually, the *Cianciulli* court found that the eight defendants who were charged with aiding and abetting charges made them legally diverse enough from the remaining fifteen defendants to warrant severance. Notably, all defendants had been charged with conspiratorial involvement, yet the court still found severance appropriate given the very realistic possibility that prejudice would exist as to each defendant and possibly deny them their due process right to a fair trial if they were tried together. Lastly, in the interests of due process and judicial economy, the court severed the remaining fifteen defendants into two separate trials. *Id.* at 848.

In applying *Cianciulli* to the case at bar, it is clear that severance is appropriate. Similar to the factual scenario in *Cianciulli*, all seven defendants here are charged as a part of a collective conspiracy – in this case, to commit Healthcare Fraud and Wire Fraud[3]. However, the defendants are also charged with other substantive crimes stemming from the alleged conspiracy. Six of the defendants are charged with a total of twenty (20) counts of substantive Healthcare Fraud.[4] Three

---

[3] Defendant maintains that charging a single conspiracy is improper in this case.
[4] Not all six defendants are charged in each of these twenty counts.

of the defendants are charged with six (6) counts of substantive Wire Fraud in violation of 18 U.S.C. § 1343 and § 2. Three defendants are charged with twenty-two (22) substantive counts of Money Laundering in violation of 18 U.S.C. § 1956(h) and one count of conspiracy to commit same. These are precisely the sort of legally diverse charges envisioned by the *Cianciulli* court.

Factors four and five of the *Gatto* inquiry ask the Court to explore the disparities in the amount or type of proof offered against the defendants and the disparities in the degrees of involvement of defendants in the overall scheme. This case involves alleged payments of over $50,000,000 from PBA to Compounding Pharmacy, and over $26,000,000 from Compounding Pharmacy to Boardwalk. The jury will be confronted with evidence showing massive amounts of cash changing hands, and an extraordinary profit being reaped by the Hickmans through their company Boardwalk. The amount of proof that will be devoted specifically to establishing a case against the Hickmans will be substantial. Similarly, the type of proof against the Hickmans will likely be highly prejudicial. The proof will likely include testimony as to how the Hickmans established and maintained their relationship with Compounding Pharmacy, how they induced doctors to sign prescriptions, and how they sustained and managed a multimillion-dollar business based solely on supposedly fraudulent prescriptions. The jury will likewise be presented with evidence in support of a laundry list of substantive Healthcare Fraud and Wire Fraud charges entirely unrelated to Mr. Schallus' alleged actions, as well as evidence to support money laundering charges against some of Mr. Schallus' codefendants. To ask a jury to distinguish these charges and the type of evidence that will be utilized to support them from the evidence proffered against those not charged with such crimes would be a difficult task that creates a significant risk of jury confusion and/or the attribution of guilt for such crimes to Mr. Schallus, who is charged with involvement in only a small fraction of the acts set forth in the indictment.

19

Also varying is the degree of alleged involvement of Mr. Schallus versus that of the Hickmans and their top-level recruiters. First, although the government has charged a single conspiracy as to all of the defendants, Mr. Schallus maintains that Count One actually charges multiple conspiracies in a single count. However, even if Count One charged a single valid conspiracy, the fact remains that the alleged involvement of each defendant varies wildly. The charge of Conspiracy to Commit Health Care Fraud and Wire Fraud alleges that the Hickmans created a company for the sole purpose of funneling prescriptions to Compounding Pharmacy and receiving kickbacks in return, inducing medical professionals to sign prescriptions, entering into relationships with recruiters, and ultimately taking in over $26,000,000. This degree of involvement stands in stark contrast to Mr. Schallus' alleged involvement. The indictment alleges that he was involved in obtaining three prescriptions and that he ultimately made $40,000, less than a thousandth of what Compounding Pharmacy was allegedly paid by PBA. In order to prevent substantial prejudice to Mr. Schallus, given the disparities in the amount and type of proof, as well as the disparate degrees of involvement, his case must be severed from that of his codefendants. While the *Cianciulli* court was "careful to note that the mere number of defendants, criminal counts or statutes involved in a case does not in and of itself justify severance," it is clear here that severance is not only appropriate, but necessary. *Id*. at 848.

C.  Limiting instructions will not cure a spill-over effect of the evidence against the Hickmans and the jury will be unable to compartmentalize the evidence as it pertains to the charges against the other defendants

Juries are presumed to follow the instructions of the court and to give each defendant's case separate consideration. *Stanford v. Parker*, 266 F.3d 422, 459 (6th Cir. 2001) (citing *Franklin v. Franklin*, 471 U S. 307, 324 (1985)). The mere potential for confusion, standing alone, will not outweigh society's interest in the speedy and efficient resolution of criminal trials. *Id.* citing *United*

*States v. Moore*, 917 F.2d 215, 222 (6th Cir. 1990). In some cases, prejudice can be remedied through limiting instructions that help the jury compartmentalize the evidence and charges against each defendant. *Brodie*, 2001 U.S. Dist. LEXIS at 8, citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). In order to succeed on a "spill-over" or jury confusion argument, the defendant must "rebut the dual presumptions that a jury will (1) capably sort through the evidence and (2) follow limiting instructions from the court to consider each defendant separately." *United States v. Grossman*, 272 F. Supp. 2d 760, 764 (N.D. Ill. 2003), quoting *United States v. Stillo*, 57 F.3d 553, 557 (7th Cir. 1995).

There is a significant risk in the case at bar that jury instructions related to how the evidence is to be weighed against each separate defendant will not cure any "spill-over" effect or assist them in compartmentalizing the evidence. The evidence proffered by the government will be voluminous. As it relates to the Hickmans, the evidence will be striking both as to the alleged scope of Boardwalks actions, as well as the sheer amount of money that allegedly passed through Boardwalk. A significant risk exists that the evidence of the Hickmans' managerial and planning efforts, including their inducement of doctors to sign prescriptions, will have a "spill-over" effect into the jury's consideration of the guilt against those charged with lesser roles.

In a case with such varying degrees of alleged culpability, it is imperative that the jury be capable of considering the weight of the evidence against each individual defendant. Given the complexity of this case, it would be improper to burden a jury with the responsibility of trying to compartmentalize evidence related to a vast number of substantive counts where Mr. Schallus is only charged in a small fraction of them. This issue is further compounded by the fact that each defendant is charged as part of a single conspiracy to commit Wire Fraud and Healthcare Fraud.

21

In order to ensure that a jury will be capable of sorting through the evidence as it relates to each individual defendant, Mr. Schallus must be severed from the other defendants.

### III. The Government Must Provide Particulars as to The Falsehoods Allegedly Contained in the Prescriptions Described in Counts 11, 12, and 13.

Mr. Schallus also moves this Court, pursuant to Federal Rule of Criminal Procedure 7(f), to direct the Government to supply the following particulars in reference to the indictment filed in this case:

1. With respect to Counts 11, 12, and 13, the specific falsehood contained in the prescriptions Hickman, Pugh, and Schallus allegedly caused to be faxed from the New Jersey doctors to Compounding Pharmacy.

Federal Rule of Criminal Procedure 7(f) provides that a defendant may move for a bill of particulars. Fed. R. Crim. P. 7(f). A bill of particulars is intended "to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense." *United States v. Belkin*, No. 93-CR-240 TNO, 1993 U.S. Dist. LEXIS 17202 at *5 (E.D. Pa. Dec. 8, 1993) (citing *United States v. Addonizio*, 451 F.2d 49, 63-64 (3d Cir. 1971)). A trial court may order that the government provide a defendant with a bill of particulars when the charging indictment "is too vague and indefinite for such purposes." *Id.* at 5.

In this context, the charging indictment is sufficient so long as it "substantially follows the language of the criminal statute, provided that its generality does not prejudice a defendant in preparing his defense nor endanger his constitutional guarantee against double jeopardy." *United States v. Knight*, 12-CR-0367 RBS, 2013 U.S. Dist. LEXIS 198970 at *2 (E.D. Pa. July 3, 2013) (citing *United States v. Eufrasio*, 935 F.2d 553, 575 (3d Cir. 1991)). Ultimately, "the decision to

grant a bill of particulars is left to the sound discretion of the trial court." *Knight* at *3 (citing *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir. 1975)).

Mr. Schallus is charged in Counts 11, 12, and 13 with Healthcare Fraud in violation of 18 U.S.C. §§ 1347 and 2. (Indictment at ¶ 26). Also charged in these Counts are Pugh and Hickman. As to all the substantive Healthcare Fraud counts, the indictment alleges that the named individuals "knowingly and willfully executed a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services[.]" (Indictment at ¶ 26). Count 11 alleges that in October 2015, William Hickman, Pugh, and and Mr. Schallus "caused prescriptions for Individual 14 to be completed and faxed to Compounding Pharmacy." *Id.* Count 12 alleges that in November 2015, William Hickman, Pugh, and Mr. Schallus "caused prescriptions for Individual 15 to be completed and faxed to Compounding Pharmacy." *Id.* Count 13 alleges that in October 2015 William Hickman, Pugh, and Mr. Schallus "caused prescriptions for Individual 16 to be completed and faxed to Compounding Pharmacy." *Id.*

Elsewhere, the indictment alleges that certain named defendants, including Mr. Schallus, conspired to "unlawfully enrich themselves by causing the submission of false and fraudulent insurance claims for compounded prescription medications to PBA and by receiving a percentage of the money that PBA paid to Compounding Pharmacy for those compounded prescription medications." (Indictment at ¶ 4). First, the indictment does not set forth how these insurance claims were false. Second, even if the indictment did set forth how the insurance claims were false, those insurance claims allegedly submitted by Compounding Pharmacy to PBA are distinct

23

from the prescriptions allegedly faxed from the New Jersey doctors' offices to Compounding Pharmacy. The indictment therefore offers scant guidance as to the factual allegations against which Mr. Schallus will have to defend himself in regard to the faxing of prescriptions.

The indictment also asserts that Sara Hickman, Thomas Schallus, John Sher, Thomas Sher, Christopher Broccoli, and others "fraudulently caused the submission of prescriptions for themselves for compounded medications in order to financially benefit themselves and/or their coconspirators." (Indictment at ¶ 17). Again, it is wholly unclear from the indictment why the submission of the prescriptions was allegedly fraudulent. The indictment alleges, in essence, that the relevant prescriptions were signed by doctors without evaluating a patient's needs, and in exchange for payment by William Hickman. (Indictment at ¶ 18 and 19). The indictment also alleges that once the prescription forms were completed with a signature of a doctor, certain defendants, including Mr. Schallus, caused the prescription to be sent via fax from the office of the signing doctor in New Jersey to Compounding Pharmacy, which filled the prescription and billed PBA. (Indictment at ¶ 20). However, nowhere in the indictment is there language describing any affirmative duties on the part of the doctors, nor does the indictment set forth what was actually communicated by faxing the prescriptions from the New Jersey doctors to Compounding Pharmacy. It is entirely unclear from the indictment what the faxed prescriptions were intended to communicate and therefore how they could have been false or fraudulent.

Moreover, the indictment specifies that the victim of the alleged Healthcare Fraud scheme was PBA. It is unclear from the indictment how faxing the prescription forms from the New Jersey doctors to Compounding Pharmacy would constitute an execution of a scheme to defraud PBA. Again, the indictment does not specify what falsehood or misrepresentation was contained in the prescriptions and, more importantly, does not assert that these prescriptions were ever sent to PBA.

In fact, if the Government's allegations are to be believed, Compounding Pharmacy was party to the scheme and would not have been defrauded by any misrepresentation in the prescriptions.

Mr. Schallus is therefore left to guess how causing a fax to be sent from a New Jersey doctors' office to Compounding Pharmacy constituted fraud, or how the prescriptions were "fraudulent." Mr. Schallus is entitled to know specifically what is fraudulent about any prescription he was allegedly connected to. Was the document counterfeit? Was the doctor's name forged? Was it issued without any contact with a doctor? Was it prescribed by the doctor without a patient consultation? Was it prescribed without medical necessity? Was it prescribed based on false statements by the patient? These questions are just a few of the examples of the lack of notice and specificity in the substantive counts. Thus, in preparing his defense, it is crucial for Mr. Schallus to know exactly what misrepresentations he is accused of making by allegedly causing the prescriptions to be faxed from New Jersey to Compounding Pharmacy.

## CONCLUSION

For the foregoing reasons, defendant Thomas Schallus respectfully requests that this Court grant his pretrial omnibus motion in full, dismiss Count One of the indictment, sever Mr. Schallus from his codefendants for trial, and order the Government to provide a bill of particulars regarding the indictment.

Respectfully Submitted,

WHIPPLE AZZARELLO, LLC

Attorneys for Defendant Thomas Schallus

By:     s/ John C. Whipple
        John C. Whipple, Esq.

Dated: May 11, 2020

26